809 So.2d 841 (2000)
Andrew Anthony APICELLA
v.
STATE.
CR-96-2285.
Court of Criminal Appeals of Alabama.
February 25, 2000.
Opinion on Return to Remand April 28, 2000.
Opinion on Return to Second Remand June 30, 2000.
Rehearing Denied August 25, 2000.
*845 Erskine R. Mathis, Birmingham, for appellant.
Bill Pryor, atty. gen., and Michelle Riley Stephens, asst. atty. gen., for appellee.
FRY, Judge.
In March 1995 the appellant, Andrew Anthony Apicella, was indicted by a Jefferson County grand jury for the offense of capital murder, a violation of § 13A-5-40(a)(10), Ala.Code 1975.[1] On May 24, 1996, after a jury trial, Apicella was found guilty of capital murder as charged in the indictment. After a sentencing hearing, the jury, by a vote of eight to four, recommended that Apicella be sentenced to life imprisonment without parole. On August 1, 1997, the trial court, after a hearing, overrode the jury's recommendation and sentenced Apicella to death by electrocution. On May 8, 1998, the trial court denied Apicella's motion for a new trial. This appeal followed.
In its sentencing order, the trial court made the following findings with regard to the facts of the crime:
"The homicides which were the basis for the charge as set out in this indictment *846 occurred on October 16, 1994, between the hours of 12:30 a.m. and 11:00 a.m. at the Changing Times Lounge at 2400 12th Avenue North, Birmingham, Jefferson County, Alabama. The time of occurrence could only be estimated as one of the victims called his son at approximately 12:30 a.m. in the early morning hours of October 16, 1994, and the bodies were discovered at approximately 11:00 a.m. later that morning on October 16, 1994. When the police were called to the scene of the homicides it was determined that five (5) people had been murdered in an `execution-style killing' in that all five (5) of the victims were lying on the floor with either one (1) or two (2) shots to the back of the head. Several of the victims' wounds indicated the presence of powder stippling, showing that the shots were fired from a relatively close range.
"Several witnesses identified the Defendant and the codefendant as being at the lounge that night but each of those witnesses left before the occurrence wherein the homicides were committed. The witnesses testified that the Defendant was accompanied by another man who was subsequently identified as Stephen Porter Pilley, who was the codefendant in this case.
"During the autopsy of each of the victims in this case, bullet projectiles or bullet fragments were recovered from the head of each victim and were subsequently examined by the Alabama Department of Forensic Sciences. It was determined that two (2) different weapons were used in the homicides, one being a .25 caliber pistol and the other being a 9mm pistol.
"Dr. Greg Davis of the Jefferson County Coroner's Office performed the autopsy on each victim and determined that the victim Eddie Dodd received two (2) gunshot wounds to the head of intermediate range, one being of a 9mm bullet and the other a .25 caliber bullet and both wounds show evidence of powder stippling. Dr. Davis further testified that on the autopsy of Ms. Pamela Dodd that she received a .25 caliber bullet wound to the head and did not notice evidence of any powder stippling. Dr. Davis testified that on the autopsy of William Nelson, Sr. that he discovered two (2) gunshot wounds to the head, one being of an apparent 9mm and the other being apparently a .25 caliber. Both wounds had evidence of powder stippling present. He further testified that on the autopsy of James Watkins that there was presence of one (1) .25 caliber bullet wound to the head and did not testify as to the presence of any powder stippling. The last victim, Florence Adell Elliott, received two (2) bullet wounds to the head, both of them being of 9mm.
"Mr. David Higgins of the Alabama Department of Forensic Sciences testified that he examined the spent projectiles that were presented to him by the Jefferson County Coroner's Office and determined that two (2) of the 9mm projectiles had been fired through the same barrel and further that the .25 caliber bullets all had similar characteristics but he could not testify positively that they were fired from the same barrel. All of the .25 bullets were CCI Blazer and the 9mm were Glazer bullets.
"A pair of pants belonging to Apicella was recovered and examined for the presence of bloodstains and the examinations did reveal the presence of bloodstains in several areas on the pants. Ms. Littie Harper of the Alabama Department of Forensic Sciences performed an analysis on the bloodstains observed on the Defendant's pants and was able to determine bloodstains in several areas. One of the bloodstains was consistent with the blood of the victim, Eddie Dodd, and the bloodstain *847 was characterized as a `transfer type stain.' Other stains were observed on the pants and were described by the witness as being consistent with high velocity stains and were observed on the right front thigh area of the pants with a few of the stains in the area below the knees. Ms. Harper could not establish as to the source donor of the bloodstains in this area.
"Further testimony from the State presented evidence that the defendants Andrew Anthony Apicella and Stephen Porter Pilley were in the Crazy Eight Lounge in Libscomb, Alabama, on the same night as the murders and were observed in conversation with each other. Witness Dennis Smith testified that he overheard a conversation, wherein Andrew Apicella had his arm around Stephen Pilley, saying that he knew a way to make easy money and further that he could get the gun. Shortly after the conversation both Andrew Apicella and Stephen Pilley left the lounge.
"Witness Rhonda Hayes further testified for the State that Andrew Apicella came by her house in the early morning hours of October 16, she further testified that she saw the defendants with approximately $150.00 each and further that there were four or five $2.00 bills in their possession. The significance of the $2.00 bills is that one of the victims, Mr. William Nelson, Sr., had a habit of saving $2.00 bills and was in possession of several $2.00 bills on the occasion of this homicide. Rhonda Hayes further testified that the defendants were in possession of narcotics and that she shared the narcotics with both defendants on that night.
"The evidence presented by the use of photographs and a video of the scene indicated that the [Changing Times] lounge had been partially ransacked during the course of the commission of the homicides. [The] cash register [was] damaged and the contents removed. It was further indicated that apparently the possessions of the victims were removed from them as jewelry belonging to the victims was later turned over to the police by an attorney representing [Apicella]."
(Supp.R. p. 15-19.)

I.
Apicella contends that the trial court erred in denying his motion for a new trial. Specifically, Apicella claims that his conviction and his sentence of death are due to be reversed because Juror S.B., prior to deliberations in the guilt phase, "talked to an attorney friend regarding the case." (Apicella's brief to this Court at p. 1.)
"[J]urors are prohibited from conducting independent investigations into any issue that arises during the trial of a case. Where juror misconduct has occurred, the question becomes whether the misconduct warrants a new trial. See Hall v. State, 348 So.2d 870, 875 (Ala.Cr.App. 1977)(`The ruling of the trial judge denying a motion for new trial will not be disturbed in the absence of a showing of abuse of discretion, and this Court will indulge every presumption in favor of the correctness of his ruling.')."
Reynolds v. City of Birmingham, 723 So.2d 822, 824 (Ala.Cr.App.1998).
During the hearing on Apicella's motion for a new trial, the trial court called Juror S.B. as a witness so that the prosecution and defense counsel could cross-examine him about his contact with Toby Roth, a local attorney. During cross-examination by the prosecutor, the following occurred:
"[Prosecutor]: And did you talk with Mr. Roth on occasions prior to rendering your verdict in this case?
"[Juror S.B.]: Yes.

*848 "[Prosecutor]: Do you recall the subject of your conversation with Mr. Roth when you called him?
"[Juror S.B.]: Yes, I do. I asked him if he could give me any insight into the law of complicity, which was discussed in jury selection.
"[Prosecutor]: Okay. Prior to calling him, you had been made aware that the case depended in some part on the law of complicity otherwise known as aiding and abetting?
"[Juror S.B.]: That's correct.
"[Prosecutor]: And you had some questions about that, I take it?
"[Juror S.B.]: That's correct.
"[Prosecutor]: All right. Now, do you recall what Mr. Roth told you about the law of complicity?
"[Juror S.B.]: No, I don't exactly. It's kind of interesting. I called him, must have been around supper time, and his wife had not gotten home yet. So he was [tending to] his little girl. She must have been about nine months. He answered the phone and she was crying at the top of her lungs. So, I was asking him a question and he was trying to tend to her. And he'd try to give me an answer and then he'd stop. And then he'd try to come back and stopped. It was pretty obvious that he was preoccupied.
"The conversation probably lasted two and a half minutes before his wife came in. She came in from work and I heard her talking to him in the background. And I knew, you know, I'd better, for his sake, let him go. Didn't look like he was doing, you know, that great at that time.
"So, you know, I let him go and really didn't get into any substantive conversation.
"[Prosecutor]: Did he tell you anything about the law of complicity?
"[Juror S.B.]: The gist of the substance of the call, as I interpreted it, was that in some cases some people may be held responsible for other people's actions.
"[Prosecutor]: Uh-huh (indicating yes).
"[Juror S.B.]: But any more specific than that, it didn't get any. And I had to interpret that myself.
"[Prosecutor]: Okay. Now, he was not aware that you were serving on that jury or on any jury?
"[Juror S.B.]: That's correct. That's correct.
"[Prosecutor]: Okay. On the day after this call or any time after you made this call to Mr. Roth, did you have occasion to mention any of that information? Not necessarily the fact of the call, but did you mention any of that information to any of your fellow jurors?
"[Juror S.B.]: No. As a matter of fact, the conversation didn't even cross my mind untilit must have been the following Monday or Tuesday that I got a call from him and he had been to church and had spoken with somebody. It must haveyeah, it had to have been Monday or Tuesday. He called and said, `Well, I heard you were on the jury.' And I said, `Yes, I was.' He said, `Well, you know, I need to contact the DA's office and let him know, you know, what I told you.'
"I said, `Well, if that's what you think you need to do, then you go ahead and do that. I don't know exactly what it is that you told me, but by all means go ahead if that's what you feel is right about it.' He said ... that's what he needed to do."
(R. Vol.X, 8-12.)
"[Prosecutor]: Did your conversation with Mr. Roth in any degree make you more comfortable with your verdict, or did it influence you?
"[Juror S.B.]: No. As I told you a few questions ago, that conversation didn't *849 even come into my mind until several days after the case was over.
"And when we came in here and we were sitting here and we were charged with the law, like I said, it never even entered my mind because it was so crystal clear as we were charged with it.
"[Prosecutor]: You mean Judge Garrett's instructions were crystal clear?
"[Juror S.B.]: That's correct. That's correct. I should say crystal clear to me.
". . . .
"[Prosecutor]: I'm not sure if I asked you this. Let me make sure that I do. At any time after you talked to Mr. Roth, did you talk to any other jurors and convey anything said by Mr. Roth?
"[Juror S.B.]: Absolutely not. As I said, and I guess I should restate, that conversation never entered my mind from the time we hung up until theit must have been the following Monday or Tuesday when he called me with his concerns. I had totally forgotten about it. It didn't seem to be a call worthy of remembering to be honest with you."
(R. Vol.X, 16-17.)
During cross-examination by defense counsel, the following occurred:
"[Defense counsel]: And was your vote during the guilt phase of the trial based upon your understanding of the law of complicity?
"[Juror S.B.]: As I was charged by Judge Garrett, yes, it was.
"[Defense counsel]: And there's no question that you talked to Mr. Roth, this friend of yours about the law of complicity prior to your voting during the guilt phase of the trial; is that correct?
"[Juror S.B.]: There is no question. That's correct.
"[Defense counsel]: [Juror S.B.], during your deliberations, we're talking about during the first phase of the trial, the guilt phase, did you discuss with your fellow jurors the issue of complicity?
"[Juror S.B.]: No.
"[Defense counsel]: Mr. Apicella's complicity in this?
"[Juror S.B.]: Did I discuss or was there discussion?
"[Defense counsel]: Did you take part in that discussion?
"[Juror S.B.]: No. What went on in the jury room primarily consisted of going over the evidence. There was a juror that voiced a concern about not understanding the law of complicity. So we asked that we be recharged and at that point we were.
"[Defense counsel]: Did Judge Garrett in his charge to you, did he tell you anything different from what you understood from talking to Mr. Roth about the law of complicity?
"[Juror S.B.]: To be honest, I didn't really understand a whole lot of what Mr. Roth said. He didn't say a whole lot. I had to interpret it myself.
"And the way we were charged with the law by Judge Garrett, as I stated before, made it so crystal clear that I wasn't even fishing for an interpretation. I mean, it was that clear to me.
". . . .
"[Defense counsel]: And after talking to Mr. Roth, did you feel like you had a better understanding?
"[Juror S.B.]: No. As I stated earlier, I could not have rendered a judgment at that point, no."
The trial court then conducted the following exchange with Juror S.B.:
"THE COURT: Is there anything that Mr. Roth said to you that in any way had any bearing on your interpretation of the law as you applied it to the evidence during your deliberation?

*850 "[Juror S.B.]: Absolutely not. I can say that without hesitation.
"THE COURT: And you say that you did not communicate anything that Mr. Roth said to you to any jurors; is that correct?
"[Juror S.B.]: That's correct.
"THE COURT: Did you apply the law as I gave it to you in my charge to the jury as to the manner in which you're to consider the evidence and the law as I gave it to you?
"[Juror S.B.]: Yes, sir. I did."
(R. Vol.X, 18-22.)
Additionally, Toby Roth testified via telephone. Roth confirmed many aspects of Juror S.B.'s testimony. Roth indicated that Juror S.B. had asked him about the law of complicity and gave him a limited example during the conversation. Roth said that when he later confronted Juror S.B. about the incident S.B. assured him that their conversation did not weigh at all in his deliberation. Roth further indicated that Juror S.B. agreed that he should inform the district attorney's office about the conversation.
Juror S.B. admitted that he obtained outside information concerning the law on complicity; juror misconduct occurred. Therefore, we must now determine if the misconduct warrants a reversal.
"`Juror misconduct will justify a new trial when it indicates bias or corruption, or when the misconduct affected the verdict, or when from the extraneous facts prejudice may be presumed as a matter of law.' Whitten v. Allstate Ins. Co., 447 So.2d 655, 658 (Ala.1984). As a general rule, `[w]here extraneous material [is] introduced into the jury's deliberations,... actual prejudice [must] be shown to work a reversal of the verdict.' Nichols v. Seaboard Coastline Ry., 341 So.2d 671, 672 (Ala.1976)."
Minshew v. State, 594 So.2d 703, 716 (Ala. Cr.App.1991).
"Alabama law has long held that not every instance of juror misconduct warrants reversal. Because a determination of which juror misconduct warrants a new trial is a highly subjective one, each instance must be decided on a case-by-case basis....
". . . .
"`The test for determining whether juror misconduct is prejudicial to the defendant and, thus, warrants a new trial is whether the misconduct might have unlawfully influenced the verdict rendered. Ex parte Troha, 462 So.2d 953, 954 (Ala.1984); Roan [v. State], 225 Ala. 428, 435, 143 So. 454, 460 (1932); Leith [v. State], 206 Ala. 439, 443, 90 So. 687, 690 (1921). Once the trial court investigates the misconduct and finds, based on competent evidence, the alleged prejudice to be lacking, this Court will not reverse. See Bascom v. State, 344 So.2d 218, 222 (Ala.Cr.App.1977).'

"Reed v. State, 547 So.2d [596], 597 [(Ala.Crim.App.1989)]."
Knight v. State, 710 So.2d 511, 515-16 (Ala.Cr.App.1997).
Applying the foregoing law to the facts presented at the hearing on Apicella's motion for a new trial, we conclude that the trial court correctly determined that Juror S.B.'s misconduct did not warrant a new trial. Juror S.B. was extensively cross-examined by the prosecutor and defense counsel and was questioned by the trial court. Juror S.B. maintained throughout his testimony that the conversation between him and Roth did not influence his deliberations and that he shared no information obtained from Roth with any other juror. Roth's testimony concerning his conversation with Juror S.B. essentially mirrored Juror S.B.'s testimony. *851 Thus, while we do not condone S.B.'s actions, we conclude from the testimony presented that Apicella has failed to meet his burden of proving that the juror misconduct either might have biased him or corrupted the jury's verdict in any way. Therefore, the trial court did not err in denying Apicella's motion for a new trial.

II.
Apicella contends that the trial court erred in denying his motion for a mistrial. Specifically, Apicella argues that, because he had to use "one of his peremptory strikes to remove a juror who should not have been on the venire," he was denied the right to strike another veniremember "who actually ended up on the jury." (Apicella's brief to this Court at p. 8.)
The record indicates that after the jury was struck and the trial had commenced, the trial court was informed that one of the veniremembers who had been peremptorily struck by Apicella was not a resident of Jefferson County.[2] During a hearing on the matter, veniremember V.K. admitted that she was a resident of north Shelby County and not Jefferson County. When asked why she had remained silent when the trial court asked the entire venire if there was anyone who was not a resident of Jefferson County, V.K. indicated she did not answer because she considered herself a resident of Birmingham. V.K., however, admitted that, even though her mailing address was Birmingham, she had a Shelby County car tag and she paid taxes in Shelby County. V.K. stated she did not intentionally try to conceal her residency but that she did not realize that residing in Shelby County affected her response to the summons to report to the Jefferson Circuit Court for jury duty. The trial court denied Apicella's motion for a mistrial.
"A mistrial should be granted only when `a high degree of manifest necessity is demonstrated.' Wadsworth v. State, 439 So.2d 790, 792 (Ala.Cr.App. 1983), cert. denied 466 U.S. 930, 104 S.Ct. 1716, 80 L.Ed.2d 188 (1984). The denial of a motion for a mistrial is within the sound discretion of the trial court, and its ruling will not be disturbed in the absence of a clear showing of abuse of discretion. Ex parte Jefferson, 473 So.2d 1110, 1114 (Ala.1985), cert. denied, 479 U.S. 922, 107 S.Ct. 328, 93 L.Ed.2d 300 (1986)."
Reed v. State, 717 So.2d 862, 867 (Ala.Cr. App.1997).
"`"We start with the basic constitutional premise that every person is entitled to an impartial jury [pursuant to the Sixth Amendment to the United States Constitution]." Knight v. State, 675 So.2d 487, 493-94 (Ala.Cr. App.1995), cert. denied, 675 So.2d 502 (Ala.1996). "It is fundamental to our system of impartial justice that `"parties have a right to have questions answered truthfully by prospective jurors to enable them to exercise their discretion wisely in exercising their peremptory strikes."'" State v. Freeman, 605 So.2d 1258, 1259 (Ala. Cr.App.1992) (quoting Ex parte O'Leary, 438 So.2d 1372, 1373 (Ala. 1983), quoting in turn Ex parte O'Leary, 417 So.2d 232, 240 (Ala. 1982)). "Voir dire" is an ancient phrase which literally means "to speak the truth." W. LaFave & J. Israel, Criminal Procedure 22.3(a) (2d. ed.1992). "`Where the party has examined *852 the jurors concerning their qualifications, and they do not answer truly, it is manifest that he is deprived of his right of challenge for cause, and is deceived into foregoing his right of peremptory challenge.'" Ex parte Ledbetter, 404 So.2d 731, 733 (Ala. 1981) (quoting Leach v. State, 31 Ala. App. 390, 18 So.2d 285, cert. denied, 245 Ala. 539, 18 So.2d 289 (1944)). "Failure to enforce the right to elicit from prospective jurors truthful answers to material questions renders hollow the right of peremptory challenge." Knight v. State, 675 So.2d at 494 (quoting Mitchell v. State, 458 So.2d 819, 821 (Fla.Dist.Ct.App. 1984)).'"
Travis v. State, 776 So.2d 819, 847 (Ala.Cr. App.1997).
"`"Although the defendant has a right to have questions answered truthfully on voir dire examination of the venire, the failure of a juror to make a proper response to a question regarding his qualifications to serve as a juror does not automatically entitle the defendant to a new trial. The proper inquiry is whether the defendant's rights were prejudiced by the juror's failure to properly and correctly respond."

"`Limbaugh v. State, 581 So.2d 5, 8 (Ala.Cr.App.1991). Furthermore, the Supreme Court of Alabama has determined that whether a party is prejudiced by the failure of a juror to answer on voir dire is "a matter primarily within the discretion of the trial court. In the absence of a showing of an abuse of discretion, the ruling of the trial court thereon will not be reversed." Land & Associates, Inc. v. Simmons, 562 So.2d 140, 148 (Ala.1989), cert. denied, General American Life Ins. Co. v. Simmons, 499 U.S. 918, 111 S.Ct. 1305, 113 L.Ed.2d 240 (1991).'"
Talley v. State, 687 So.2d 1261, 1271 (Ala. Cr.App.1996), quoting Long v. State, 621 So.2d 383, 387 (Ala.Cr.App.1993), cert. denied, 510 U.S. 932, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993).
"`"Although the factors upon which the trial court's determination of prejudice is made must necessarily vary from case to case, some of the factors which other courts have considered pertinent are: temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about."' Johnson v. State, 536 So.2d 957, 958 (Ala.Cr.App. 1987), cert. denied, 490 U.S. 1046, 109 S.Ct. 1955, 104 L.Ed.2d 424 (1989) (quoting Smithson v. State, 50 Ala. App. 318, 320-21, 278 So.2d 766 (1973)). See also Campbell v. Williams, 638 So.2d 804, 813 (Ala. 1994), cert. denied, 513 U.S. 868, 115 S.Ct. 188, 130 L.Ed.2d 121 (1994). "Thus, the facts in each case must be considered individually and much will remain in the discretion of the trial judge." Parish v. State, 480 So.2d 29, 30 (Ala.Cr.App.1985).'

"Tomlin v. State, 695 So.2d 157, 170 (Ala.Cr.App.1996)."
Travis v. State, 776 So.2d at 848.
Temporal remoteness, ambiguity of the question, or V.K.'s failure to recollect do not provide an excuse for her failure to respond truthfully to the trial court's question. We conclude, however, that V.K.'s failure to respond was at most negligent. At the hearing, V.K. straightforwardly admitted that, although her mailing address was Birmingham, she purchased her car tag in Shelby County. Her response that she did not realize the significance *853 of her residency on her ability to serve as a juror appears genuine, and it was reasonable for a layperson. There is no indication in the record that V.K. had a conscious disregard and disrespect for truthfulness in the judicial forum.
We recognize, nevertheless, that even if her failure to disclose was unintentional, but prejudicial, the outcome would be the same as if her failure to disclose had been deliberate. See Tomlin, supra. We, however, do not find any prejudice. We believe that this situation is analogous to Huckabaa v. State, 475 So.2d 891 (Ala.Cr. App.1985). In Huckabaa, the appellant argued that the trial court had erred in denying his motion for a new trial because the evidence at the hearing on the motion indicated one of the jurors at his trial was not a resident of the county in which he was being tried. This Court stated:
"We again hold, as this Court did, in Pogue v. State, Ala.Cr.App., 429 So.2d 1159, 1160, cert. denied, Ala. (1983):
"`In Bufford v. State, 382 So.2d 1162, 1172-73 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980), this Court held that the denial of a motion for new trial, based on the ground that one juror was not a resident of the county in which the offense was committed, was not error in the absence of a showing of prejudice to the accused.
"`"(T)he mere fact that she resided in an adjoining county does not per se require the reversal of this cause. Non residency in such a case does not impute prejudice per se.... Therefore, there is no inherent prejudice attributed to a trial by a non resident or non residents of the county in which the offense was committed."
"`Although the incompetency of a juror because he is not a resident of the county in which the trial was had is ground for challenge for cause, "`the right to challenge ends, when the persons selected are sworn as jurors.'" Carson v. Pointer, 11 Ala.App. 462, 465, 66 So. 910 (1914), quoting from Henry v. State, 77 Ala. 75, 77 (1884)....'
"We conclude that appellant has failed to show any error prejudicial to defendant...."
Huckabaa v. State, 475 So.2d at 893.
If a defendant is not prejudiced by having a nonresident serve as a juror, we fail to see, and Apicella does not demonstrate, how the issue was material to his trial or how he was prejudiced by his having to use a peremptory strike to remove V.K. Apicella makes no showing as to how he would have used this peremptory strike differently. Moreover, if V.K., who was Apicella's next to the last strike, had been removed for cause from the venire, Apicella would have received one less peremptory strike. The record does not indicate, and Apicella does not allege in his brief, that his last strike would have been any different. Thus, Apicella's total number of peremptory strikes was not effectively reduced by the trial court's failure to strike V.K. for cause. Based on the foregoing, we reject Apicella's argument that the fact that he had to use a peremptory strike to remove V.K. was prejudicial and effectively reduced his strikes, preventing him from striking another veniremember. There is simply no evidence that Apicella was prejudiced by V.K.'s not informing the trial court that she was not a resident of Jefferson County. Under the facts of this case, Apicella was not prejudiced and did not demonstrate the "high degree of manifest necessity" required to warrant a mistrial. The trial court did not abuse its discretion in denying the motion for mistrial.

*854 III.
Apicella claims that he was denied the right to a speedy trial because, he says, there was a 14-month delay between the jury's returning a recommendation that he be sentenced to life imprisonment without parole and the trial court's imposition of sentence. Specifically, he argues that the trial court's determination regarding his sentence was influenced by his codefendant's trial[3] which was conducted during the delay. Apicella alleges that "the only reason the trial court waited until after [his codefendant's] trial [to impose his sentence] was so he could give them both the same sentence." (Apicella's brief to this Court at p. 11.)
The record indicates that the jury returned its advisory verdict recommending life imprisonment without parole on May 24, 1996. Apicella filed a motion for sentencing on December 3, 1996. The trial court denied the motion on February 26, 1997. On August 1, 1997, the trial court sentenced Apicella to death by electrocution.
A defendant's right to a speedy trial encompasses the imposition of sentence. Hurst v. State, 516 So.2d 904 (Ala. Cr.App.1987). However, in Dykes v. State, 452 So.2d 1377, 1380 (Ala.Cr.App.1984), this Court observed:
"[I]t should be noted, as it was in United States v. MacDonald, 456 U.S. 1, at 8, 102 S.Ct. 1497 at 1502, 71 L.Ed.2d 696 (1982), that:
"`The Sixth Amendment right to a speedy trial is thus not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.'"
Moreover, this Court has previously stated:
"In deciding whether the appellant was denied his right to a speedy trial, we apply the four-prong test set out in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). See also Wade v. State, 381 So.2d 1057 (Ala.Cr. App.1980). The factors to be weighted are the `[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.' Barker, 407 U.S. at 530, 92 S.Ct. at 2192."
Arnett v. State, 551 So.2d 1158, 1159 (Ala. Cr.App.1989).
In Noe v. State, 391 So.2d 151 (Ala.Cr. App.1980), the appellant claimed that a 13-month interval between the entry of his guilty plea and his sentencing violated his right to a speedy trial. In rejecting the appellant's argument, this Court stated:
"As the Supreme Court of the United States recognized in Bozza v. United States, 330 U.S. 160, 67 S.Ct. 645, 91 L.Ed. 818 [1947]:
"`This Court has rejected the "doctrine that a prisoner, whose guilt is established by a regular verdict, is to escape punishment altogether because the court committed an error in passing the sentence." ... The constitution does not require that sentencing *855 should be a game in which a wrong move by the judge means immunity for the prisoner.'"
391 So.2d at 153.
In light of the foregoing law, we analyze Apicella's claim that he was denied the right to a speedy trial.

A. Length of delay.
"`The length of delay must be presumptively prejudicial before inquiry is made into the remaining [Barker v. Wingo, supra] factors. Whether a delay is presumptively prejudicial requires [a] case-by-case determination. Payne v. State, 683 So.2d 440, 451 (Ala.Cr.App. 1995)."
Campbell v. State, 709 So.2d 1329, 1334 (Ala.Cr.App.1997).
"`Regarding this element of the Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), analysis, it is an established principle of Alabama law that a defendant is not denied a speedy trial merely because of the passage of time.' Bishop v. State, 656 So.2d 398, 400 (Ala.Cr.App.1994).
"`This court has held that delays of more than 13 months [the length of the delay in [State v.] Anderson[, 640 So.2d 1061 (Ala.Cr.App.1994)]] were not presumptively prejudicial. See Vo v. State, 612 So.2d 1323 (Ala.Cr.App. 1992) (15-month delay not presumptively prejudicial); Kelley v. State, 568 So.2d 405 (Ala.Cr.App.1990) (15-month delay not presumptively prejudicial); Arnett v. State, 551 So.2d 1158 (Ala.Cr.App.1989) (20-month delay not presumptively prejudicial); Dykes v. State, 452 So.2d 1377 (Ala.Cr.App. 1984) (15-month delay not presumptively prejudicial).'
"[State v.] Anderson, 640 So.2d [1061], 1063 [(Ala.Cr.App.1994)]."
Johnson v. State, 680 So.2d 1005, 1008 (Ala.Cr.App.1996).
Apicella was sentenced over 14 months after the jury returned its advisory verdict. Apicella was convicted of a capital offense; therefore, his incarceration was mandatory and he had no right to bond. We conclude that the passage of 14 months before imposing sentence in this situation was not presumptively prejudicial. See Noe v. State, supra.
Although we find that the delay was not presumptively prejudicial, because Apicella was sentenced to death we will examine the remaining factors articulated in Barker.

B. Reasons for the delay.
The record indicates that the reason for the delay in sentencing Apicella resulted from the need to conduct an adequate presentence investigation. Before the trial court can impose sentence in a capital case, it must order and receive a presentence investigation and report. See § 13A-5-47(b), Ala.Code 1975. The record indicates that Apicella's presentence investigation and report were not completed until July 31, 1997. (C.R.274.) The trial court could not impose sentence before that date. While we encourage sentencing courts to make every effort to impose sentence within a reasonable time from the rendition of a verdict, we are also cognizant that certain delays are beyond the control of the defendant, the state, and even the trial court. We conclude that the delay in this situation, caused by the need to conduct an adequate presentence investigation, was not unreasonable.
We acknowledge that the record indicates that Apicella was sentenced after the trial and sentencing of his codefendant, Stephen Pilley. However, Apicella offers only bare allegations that the trial court was influenced by Pilley's trial and that the sentencing in his case was delayed because the trial court wanted to impose the same sentence on both defendants. *856 Apicella provides no facts from the record or any other source in support of his conclusion that the trial court delayed his sentencing for this reason. In our review of the record, we find nothing to indicate that the trial court's delay in sentencing was due, as argued by Apicella, to a desire to impose the same sentence on both defendants. Likewise, the record is devoid of any indication that the trial court was influenced by Pilley's trial in imposing Apicella's sentence. Thus, Apicella has failed to present any improper reason for the delay.

C. Defendant's assertion of his right.
The record indicates that the jury returned its advisory verdict on May 24, 1996. (C.R.5.) On December 2, 1996, Apicella's sentencing was set for April 18, 1997. Apicella's motion for sentencing was filed on December 3, 1996, and was denied on February 26, 1997.[4] (C.R.6.) We find no indication in the record that Apicella filed any additional motions for sentencing subsequent to the denial of the first motion.
"`"The defendant's assertion of his speedy trial right ... is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." ... The failure of a defendant to assert his right to a speedy trial, however, does not demonstrate that there was no constitutional violation.... However, the Supreme Court has emphasized that "the failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." ... The timeliness, vigor and frequency with which the right to a speedy trial is asserted are probative indications of whether a defendant was denied needed access to a speedy trial over his objection.'"
Holland v. State, 615 So.2d 1313, 1315-16 (Ala.Cr.App.1993) quoting Redd v. Sowders 809 F.2d 1266, 1270-71 (6th Cir.1987).
Because Apicella waited more than six months after his verdict was returned before filing his motion for sentencing and because he failed to file any additional motions after his first request was denied, we conclude that Apicella has failed to demonstrate that he was "denied needed access to a speedy trial over his objection."

D. Prejudice to the defendant.
Apicella claims he was prejudiced by the delay in his sentencing because, he says:
1) The Jefferson County jail (hereinafter JCJ) is overcrowded;
2) His visitation was more restricted at the JCJ than it would have been at the state penitentiary,
3) He was denied access to state programs while in the JCJ,
4) His appeal was delayed, and
5) His defense in a possible retrial was hindered.
(Apicella's reply brief to this Court at p. 7.) Apicella merely lists these alleged prejudices; he offers no evidence in support of these claims. After reviewing these claims in light of the entire record and in consideration of the nature and the character of the crime for which Apicella was convicted and the possible sentences that could be imposed, we conclude that he was not prejudiced by any delay. Apicella was convicted of capital murder; it was mandatory that the trial court order a presentence investigation and consider the report when imposing sentence. Any of Apicella's claims of alleged prejudice in comparison to the gravity of his convictions and the responsibilities of the trial court in imposing sentence appear imprudent. Based on *857 the above analysis, we conclude that Apicella has failed to prove that he was prejudiced by the 14-month delay in his sentencing.
After carefully balancing the four considerations set out in Barker, we conclude that Apicella was not denied.

IV.
Apicella argues that the trial court erred in refusing his request for an instruction on the lesser-included offense of felony murder. Specifically, Apicella claims the trial court should have instructed the jury on the offense of felony murder because, he says, a "jury could reasonably have found from the evidence that [he] killed or caused the death of one person and not two or more people." (Apicella's brief to this Court at p. 15.)
Section 13A-5-41, Ala.Code 1975, states:
"Subject to the provisions of § 13A-1-9(b), the jury may find a defendant indicted for a crime defined in § 13A-5-40(a), not guilty of the capital offense but guilty of a lesser included offense or offenses. Lesser included offenses shall be defined as provided in § 13A-1-9(a), and when there is a rational basis for such a verdict, include but are not limited to, murder as defined in § 13A-6-2(a), and the accompanying other felony, if any, in the provision of § 13A-5-40(a) upon which the indictment is based."
Moreover, "`[a] charge on a lesser, non-capital offense is required only when there is a basis in the evidence which provides a reasonable theory supportive of the charge. Beck v. State, 396 So.2d 645 (Ala.1980).'" Ex parte Myers, 699 So.2d 1285, 1291 (Ala.1997), cert. denied, 522 U.S. 1054, 118 S.Ct. 706, 139 L.Ed.2d 648 (1998), quoting Godbolt v. State, 429 So.2d 1131, 1134 (Ala.Cr.App.1982). A defendant may be entitled to a lesser included charge "even if the evidence supporting the charge is offered by the State." 699 So.2d at 1290-91.
Sections 13A-1-9(a) and (b), Ala.Code 1975, state:
"(a) A defendant may be convicted of an offense included in an offense charged. An offense is an included one if:
"(1) It is established by proof of the same or fewer than all the facts required to establish the commission of the offense charged; or
"(2) It consists of an attempt or solicitation to commit the offense charged or to commit a lesser included offense; or
"(3) It is specifically designated by statute as a lesser degree of the offense charged; or
"(4) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interests, or a lesser kind of culpability suffices to establish its commission.
"(b) The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense."
A defendant is entitled to a jury charge only on an applicable lesser-included offense to the offense charged in the indictment. Holladay v. State, 549 So.2d 122, 129 (Ala.Cr.App.1988), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989)(emphasis added.).
Applying the foregoing law to this case, we must determine, in light of the offense charged in the indictment, whether felony murder is a lesser-included offense to this capital murder. The state elected to prosecute Apicella for murder made capital because two or more persons were killed *858 pursuant to one act or one scheme or course of conduct. See § 13A-5-40(a)(10), Ala.Code 1975. Apicella argues that he was entitled to a charge on the lesser-included offense of felony murder because, he says, the murders occurred during a robbery. Felony murder is defined in § 13A-6-2(a)(3), Ala.Code 1975, as follows:
"A person commits the crime of murder if:
". . . .
"(3) He commits or attempts to commit ... robbery in any degree ... or any other felony clearly dangerous to human life and, in the course of and in furtherance of the crime that he is committing or attempting to commit, or in immediate flight therefrom, he, or another participant if there be any, causes the death of any person."
This Court has stated:
"`[T]he purpose of the felony-murder doctrine is to hold felons accountable for unintended deaths caused by their dangerous conduct.' W. LaFave and A. Scott, 2 Substantive Criminal Law § 7.5 at 210 (1986). See Ex parte Ritter, 375 So.2d 270, 273-274 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3044, 65 L.Ed.2d 1133 (1980); Ex parte Bates, 461 So.2d 5, 7 (Ala.1984)."
White v. State, 587 So.2d 1218, 1231 (Ala. Cr.App.1990), aff'd, 587 So.2d 1236 (Ala. 1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992).
We conclude that felony murder is not a lesser included offense to murder made capital because two or more persons were killed pursuant to one course of conduct, the offense charged in the indictment.
A person commits the crime of felony murder if:
"He commits or attempts to commit arson in the first degree, burglary in the first or second degree, escape in the first degree, kidnapping in the first degree, rape in the first degree, robbery in any degree, sodomy in the first degree or any other felony clearly dangerous to human life and, in the course of and in furtherance of the crime that he is committing or attempting to commit, or in immediate flight therefrom, he, or another participant if there be any, causes the death of any person."
Section 13A-6-2(a)(3), Ala.Code 1975. The offense of felony murder involves an intended felony and an unintended homicide. See Williams v. State, 601 So.2d 1062 (Ala.Cr.App.1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992).
Felony murder is not applicable to the offense charged because capital murder when two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct includes two intentional murders. See Holladay v. State, 549 So.2d 122, 130 (Ala.Cr.App. 1988), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989). Thus, there was no reasonable basis for an instruction on felony murder.
Moreover, we reject Apicella's argument that the facts establish the basis for an instruction on felony murder, in this case, murder during the course of a robbery. Apicella was not indicted for capital murder during a robbery and this offense was not established by the same or fewer than all the facts required to establish the commission of the murder of two or more persons. See § 13A-1-9(a)(1), Ala.Code 1975. Cf. Thomas v. State, 452 So.2d 899, 903 (Ala.Cr.App.1984)("It is clear that murder during the course of a robbery as specified in § 13A-6-2(a)(3) cannot be a lesser-included offense of § 13A-6-2(a)(1) intentional murder because one may be convicted of the subsection (1) intentional murder offense without proof of the robbery *859 required for the subsection (3) felony murder offense. See § 13A-1-9(a)(1), Ala. Code 1975."). Murder during the course of a robbery does not consist of "an attempt or solicitation to commit" the murder of two or more persons. See § 13A-1-9(a)(2), Ala.Code 1975. Murder during the course of a robbery is not "specifically designated by statute as a lesser degree" of the murder of two or more persons. See § 13A-1-9(a)(3), Ala.Code 1975. Lastly, murder during the course of a robbery does not differ from the murder of two or more persons "only in the respect that a less serious injury or risk of injury or lesser kind of culpability suffices to establish the offense charged." See § 13A-1-9(a)(4), Ala.Code 1975. Thus, felony murder for a murder that occurred during the course of a robbery is not an offense included in the charged offense of the murder made capital because two or more persons were killed during one course of conduct and the trial court did not err in refusing to give such an instruction.
We recognize that the facts revealed at trial may have supported charging Apicella with capital murder because the killings during the course of a robbery in the first degree or an attempt thereof, see § 13A-5-40(a)(2), Ala.Code 1975. However, Apicella was not charged with this offense; therefore, this evidence is not determinative of whether felony murder is a lesser-included offense of the offense charged. Because Apicella was not entitled to an instruction on felony murder, the trial court did not err in refusing the requested charge.
Additionally, Apicella argues that a charge on intentional murder was appropriate. Specifically, he claims that the jury could have reasonably concluded that he killed only one of the victims and thus could not be guilty of capital murder based on the killing of two or more persons because, he says, blood from only one victim was found on a pair of pants seized from his residence. Based on the following facts adduced at trial, we find Apicella's claim to be without merit.
Lilly Harper, an employee in the biology section of the Alabama Department of Forensic Sciences, testified that she analyzed seven bloodstains found on the pants seized from Apicella's residence. Harper said of those seven stains, the blood in five of the stains was consistent with that of Apicella. One of the stains, in her opinion, was the blood of Eddie Dodd, one of the victims. The final stain, according to Harper, was a mix. Harper said she excluded four of the five victims as the source, but, because of a limitation in the testing of the blood of one of the victims, Pamela Dodd, she could not say if Pamela Dodd's blood was in the stain. Harper did state, however, that Apicella "could not be excluded from being a donor of that stain." (R. 989.)
Apicella argues that Harper's testimony conclusively indicates that he was involved only in the murder of Eddie Dodd. However, while Harper's testimony does directly indicate that Apicella was involved in Eddie Dodd's murder, it does not, as Apicella argues, negate the inference that the final stain may consist of blood from victim Pamela Dodd. Therefore, evidence was presented from which the jury could reasonably have inferred that Apicella was involved in the murder of both Eddie Dodd and Pamela Dodd.
Additionally, the testimony adduced at trial indicated that, even if it was proven that he did not pull the trigger, Apicella was clearly an accomplice. There was testimony that Apicella had asked Pilley if he wanted to make some easy money, and that Apicella had told Pilley he knew where to get a gun. The testimony indicated that Apicella had been to the Changing *860 Times Lounge, the crime scene, on five or six occasions before the incident. Jewelry from some of the victims was turned over to police by Apicella's former attorney, indicating that Apicella possessed items owned by at least some of the victims. Forensics testimony established that all of the victims were shot twice in the head at close range and that two different guns were used.[5] In one of his statements to police, Apicella admitted being present when the murders took place, but he claimed he did not participate in them. Thus, sufficient evidence was presented that Apicella was at a minimum an accomplice to the murders of two or more persons and whether Apicella pulled the trigger in the murders is of no legal consequence.
In addressing an argument similar to Apicella's, this Court recently stated:
"`The appellant appears to believe that, if he intended to kill the victim, but did not actually participate in the killing, remaining only an observer who was there to render aid if the need arose, and actively participated in only the robbery, he would be guilty of intentional murder rather than capital murder. However, in Alabama, an individual who is present with the intent to aid and abet in the commission of an offense is as guilty as the [principal] wrongdoer. §§ 13A-2-20, -23, Code of Alabama 1975. See Stokley v. State, 254 Ala. 534, 49 So.2d 284 (1950); Robinson v. State, 335 So.2d 420 (Ala.Cr.App.1976), cert. denied, 335 So.2d 426 (Ala.1976); Heard v. State, 351 So.2d 686 (Ala.Cr.App. 1977); Hill v. State, 348 So.2d 848 (Ala. Cr.App.1977), cert. denied, 348 So.2d 857 (Ala.1977). "A conviction of one charged in the indictment with having been the actual perpetrator of a crime is authorized on proof of a conspiracy or that the accused aided an abetted in the commission of the crime. Stokley v. State, 254 Ala. 534, 49 So.2d 284 (1950). An aider and abettor would be indicted directly with the commission of the substantive crime and the charge may be supported by proof that he only aided and abetted in its commission. Pope v. State, 365 So.2d 369 (Ala.Cr.App.1978)." Killough v. State, 438 So.2d 311 (Ala.Cr.App. 1982), reversed on other grounds, 438 So.2d 333 (Ala.1983). As long as the appellant intentionally promoted or aided in the commission of the killing itself, whether he actually committed the murder does not affect his liability or his guilt. Lewis v. State, 456 So.2d 413 (Ala.Cr.App.1984). The trial court instructed the jury as tho the laws of complicity and accomplice liability in the present case.'"
McWhorter v. State, 781 So.2d 257 (Ala.Cr. App.1999), quoting Price v. State, 725 So.2d 1003, 1054-55 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).
Just as we rejected the appellant's argument in McWhorter, we reject Apicella's argument. The state's evidence established complicity. We have reviewed the trial court's entire charge to the jury; it gave a very thorough jury instruction concerning the theory of complicity. Even if the jury believed that Apicella had killed only one of the victims, the verdict indicates that it also believed that he intended to aid and abet in the murders of the four other victims. Thus, there is no reasonable theory to support an intentional-murder charge.
We conclude that the trial court did not err in failing to instruct the jury on the *861 lesser-included offenses of felony murder and intentional murder because there is no reasonable theory of the evidence in light of the offense charged that would support a conviction for either of these lesser-included offenses.

V.
Apicella contends that the trial court erred in denying his motion for a new trial based on newly discovered evidence.
In Travis v. State, 776 So.2d 819, this Court stated:
"`[I]n order to establish the necessity for a new trial based on newly discovered evidence, the appellant must prove: (1) that the evidence was discovered after the trial; (2) that the evidence could not have been discovered prior to trial by due diligence on the part of the movant; (3) that the evidence is material to the issue of the appellant's guilt; (4) that the evidence is not merely cumulative or impeaching; and (5) that the evidence would probably change the outcome if a new trial was granted.... The trial court is entitled to great deference in determining whether newly discovered evidence warrants a new trial and that decision will not be reversed absent a clear abuse of discretion.'"
776 So.2d at 837, quoting Gillespie v. State, 644 So.2d 1284, 1289 (Ala.Cr.App.1994).
This Court addressed a similar issue in Snyder v. State, 683 So.2d 45 (Ala.Cr.App. 1996), wherein we stated:
"`The testimony of a witness that a person, other than the defendant, confessed to the witness that he himself committed the crime charged against the defendant, is hearsay and inadmissible. Welsh v. State, 96 Ala. 92, 96, 11 So. 450 (1891) [1892]. "Such declarations are hearsay evidence, the weakest, most uncertain, and most dangerous." Snow v. State, 58 Ala. 372, 375 (1877); Smith v. State, 9 Ala. 990, 995-96 (1846); Prince v. State, 356 So.2d 750, 751 (Ala.Cr.App.1978).'

"Garrison v. State, 416 So.2d 793, 794 (Ala.Cr.App.1982).
"The proposed evidence would not have been admissible at trial because it was hearsay; therefore, the trial court committed no error in denying the appellant's motion for a new trial. `Error does not occur when the trial court denied the motion for new trial based on evidence that would not have been admissible at a new trial.' King v. State, 574 So.2d 921, 925 (Ala.Cr.App.1990)."
683 So.2d at 46-47. See also McBryar v. State, 368 So.2d 568, 574 (Ala.Cr.App.1979) (defendant was not entitled to a new trial based on affidavits and depositions from inmates stating that another inmate told them that he had committed the murder).
The newly discovered evidence in this case was a letter from Grover Allen, an inmate at Holman prison, to defense counsel. The letter stated that Pilley, Apicella's codefendant, had told him that he alone committed the crime. In the hearing on the motion for a new trial, Allen testified that, after learning that Apicella had been convicted of capital murder, Pilley told him that Apicella tried to stop him from shooting the victims, and that he alone committed the murders.
Given that Allen's testimony that Apicella's codefendant confessed to murders was hearsay evidence and would not have been admissible at trial, the trial court did not abuse its discretion in denying the motion for a new trial.

VI.
Apicella maintains that written charges should have been sent back with the jury during its deliberations. Specifically, he argues that because he was charged with capital murder and because the jury asked the trial court to reinstruct it on complicity, *862 the trial court should have submitted written instructions to the jury.
Rule 21.1, Ala.R.Crim.P., states, in pertinent part:
"Neither a copy of the charges against the defendant nor the `given' written instructions shall go into the jury room; provided, however, that the court may, in its discretion, submit the written charges to the jury in a complex case."
Additionally, the committee comments to Rule 21 state: "The rule ... allows the judge the discretion to give the jury a copy of the charges when he feels it would be helpful to do so."
A trial court's determination on whether to submit written charges to the jury in a complex case will not be overturned absent a showing of an abuse of discretion. See Wright v. State, 740 So.2d 1147 (Ala.Cr.App.1999) (sending written charges to the jury during deliberations was not an abuse of discretion). See also Gaddy v. State, 698 So.2d 1100, 1147 (Ala. Cr.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997) (denying a request to send written charges back with the jury during its deliberations during the guilt phase in a capital murder trial was not error).
The record indicates that the trial court denied defense counsel's request to submit written instructions to the jury. However, the trial court read several instructions requested by the defense to the jury, and the trial court reinstructed the jury on complicity when the jury requested it to do so.
Based on the foregoing, we conclude that the trial court did not abuse its discretion in denying Apicella's request to submit the written charges to the jury.

VII.
Finally, in our search of the entire record for any error that may have adversely affected Apicella's substantial rights, pursuant to Rule 45A, Ala.R.App. P., we conclude that Apicella received a fair trial. However, we find that the trial court's written sentencing order is deficient in that the trial court failed to comply with the requirement of § 13A-5-47(d), Ala.Code 1975, that it "enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional mitigating circumstances offered pursuant to § 13A-5-52." (Emphasis added.) Additionally, we note that while the trial court recognized in its order that the defense presented evidence of nonstatutory mitigating circumstances, the trial court's order does not indicate that it considered the evidence in its weighing of the aggravating circumstance against the mitigating circumstances. Therefore, due to the deficiencies in the sentencing order, we remand this cause to the trial court with directions that that court enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional nonstatutory mitigating circumstances offered pursuant to § 13A-5-52, and, once again, decide the appropriate punishment by reweighing the aggravating circumstance against the mitigating circumstances. See Borden v. State, 769 So.2d 935 (Ala.Cr. App.1997); Murry v. State, 562 So.2d 1348 (Ala.Cr.App.1988); and Daniels v. State, 534 So.2d 628 (Ala.Cr.App.1985), aff'd, 534 So.2d 656 (Ala.1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987). No evidentiary hearing is required. The rewritten sentencing order of the trial court shall be filed in this court within 35 days from the date of this opinion.
*863 AFFIRMED AS TO CONVICTION; REMANDED WITH DIRECTIONS AS TO SENTENCING.
LONG, P.J., and McMILLAN and COBB, JJ., concur.
BASCHAB, J., concurs in result only.

On Return to Remand
FRY, Judge.
This cause was originally remanded to the trial court "with directions that that court enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, [Ala.Code 1975,] each mitigating circumstance enumerated in § 13A-5-51, and any additional nonstatutory mitigating circumstances offered pursuant to § 13A-5-52" and then, after considering these findings, to determine the appropriate punishment. See Apicella v. State, 809 So.2d 841, 862 (Ala.Cr.App.2000)(Baschab, J., concurring in result only). The trial court has complied with those directions and has submitted a new sentencing order on return to remand that satisfies the statutory requirements.
While conducting our review of the propriety of Apicella's sentence of death, pursuant to § 13A-5-53, Ala.Code 1975, we found that the trial court had stated in its sentencing order:
"The Court does not find statutory mitigating circumstance under Section 13A-5-51(1) to be present, to-wit: the defendant has no significant history of prior criminal activity because according to the pre-sentence investigation as prepared by the Alabama Board of Pardon and Paroles, the defendant has been arrested and in some cases convicted for driving under the influence on five (5) different occasions and was arrested for Burglary in 1976 with no disposition found, was arrested and charged with violation of Uniform Alabama Controlled Substances Act in 1977 and no disposition could be found. The Court further found from the investigation that the defendant was arrested for violation of Uniform Alabama Controlled Substances Act by the police department in Fairfield, Alabama, and fined $110.00 and further was arrested for the violation of Uniform Alabama Controlled Substances Act and pled guilty in the municipal court of the City of Birmingham and received a suspended misdemeanor sentence. The defendant was also arrested by the police department of Louisville, Kentucky for wanton endangerment in the first degree and carrying a concealed weapon in 1988. He was also charged in 1988 with robbery second degree; however, all of the felony cases for which the defendant was charged either the dispositions could not be found or the cases were dismissed. Even though the defendant has not been convicted of a prior felony conviction the Court finds that the consistent arrest record of the defendant for serious offenses disqualified him under this particular mitigating circumstance; therefore, the Court does not find this mitigating circumstance to be present."
(R. on remand. 4-5.)(Emphasis added.)
Under Alabama law, "only convictions can negate the statutory mitigating circumstance of no significant prior criminal record. § 13A-5-51, Ala.Code 1975; Freeman v. State, 651 So.2d 576, 597-98 (Ala.Cr.App.1994)." Ex parte Burgess, [Ms. 1980810, January 28, 2000] (Ala. 2000).[*] See also Hallford v. State, 548 *864 So.2d 526, 544 (Ala.Cr.App.1988); Cook v. State, 369 So.2d 1251 (Ala.1979). This Court has upheld the practice of not applying this mitigating provision when the significant history was based on prior misdemeanor convictions. Williams v. State, 601 So.2d 1062, 1084 (Ala.Cr.App.1991). See Richardson v. State, 376 So.2d 205 (Ala.Cr.App.1978), aff'd, 376 So.2d 228 (Ala.1979).
Although we are reluctant to remand this cause, because the trial court's order indicates that it made its determination that Apicella did not have a significant history of prior criminal conduct based on Apicella's arrest record, we do not believe the trial court's finding will withstand the rigors of the appellate review process. Thus, we must remand this cause with directions that the trial court reevaluate the existence or nonexistence of this mitigating circumstance based only on Apicella's convictions. As previously instructed, the trial court should also enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional nonstatutory mitigating circumstances offered pursuant to § 13A-5-52, and, once again, decide the appropriate punishment by reweighing the aggravating circumstance against the mitigating circumstances. No evidentiary hearing is required. The rewritten sentencing order of the trial court shall be filed in this court within 35 days from the date of this opinion.
REMANDED WITH DIRECTIONS.
LONG, P.J., and McMILLAN, COBB, and BASCHAB, JJ., concur.

On Return to Second Remand
FRY, Judge.
On February 25, 2000, we affirmed Andrew Anthony Apicella's conviction for capital murder and remanded the case to the trial court "with directions that that court enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, [Ala.Code 1975,] each mitigating circumstance enumerated in § 13A-5-51, and any additional nonstatutory mitigating circumstances offered pursuant to § 13A-5-52." See Apicella v. State, 809 So.2d 841, 862 (Ala.Cr.App. 2000). The trial court complied with our order, but while we were conducting our review on return to remand, we concluded that the trial court's findings with regard to the statutory mitigating circumstance that Apicella had no significant criminal record, see § 13A-5-51(1), Ala.Code 1975, were not supported by the record. We again remanded the cause to the trial court for consideration of the applicable law with regard to the existence of this mitigating circumstance. The trial court has complied with those directions and has submitted an amended sentencing order on return to our second remand order that satisfies the statutory requirements.
Section 13A-5-53, Ala.Code 1975, requires that this Court address the propriety of Apicella's sentence to death. Apicella was indicted and was convicted of capital murder, defined in § 13A-5-49(10), i.e., murder wherein two or more persons are murdered pursuant to one act or pursuant to one scheme or course of conduct.
The record indicates that Apicella's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary *865 factor. § 13A-5-53(b)(1), Ala.Code 1975.
A review of the record reflects that the trial court found the existence of one aggravating circumstance and one mitigating circumstance. It then correctly found that the aggravating circumstance outweighed the mitigating circumstance. The trial court reviewed all the evidence offered and found that the capital offense was committed while the defendant was engaged or was an accomplice in the commission of or in an attempt to commit or flight after committing or attempting to commit robbery in the first degree. See § 13A-5-49(4), Ala.Code 1975. The trial court found the existence of the statutory mitigating circumstance that Apicella had no significant history of prior criminal activity. See § 13A-5-51(1), Ala.Code 1975. The trial court did not find any nonstatutory mitigating circumstances. See § 13A-5-52. The trial court weighed the aggravating circumstance against the mitigating circumstance, overrode the jury's recommendation of life imprisonment without the possibility of parole, and sentenced Apicella to death. The trial court stated, "This Court in its almost twenty (20) years on the bench has handled over a hundred capital cases and this one case by this defendant and codefendant stands out as an example of behavior which shocked the Court in the needless execution of five (5) victims during the course of the commission of a robbery." We agree with the trial court's findings in the present case.
However, pursuant to § 13A-5-53(b), Ala.Code 1975, we must independently weigh the aggravating circumstances and the mitigating circumstances to determine the propriety of Apicella's sentence. After an independent weighing, we are convinced that the sentence of death is the appropriate sentence in this case.
We also conclude that Apicella's sentence was not disproportionate or excessive when compared to the penalties imposed in similar cases. See § 13A-5-53(b)(3), Ala.Code 1975. See Maxwell v. State, [Ms. CR-97-2150, May 26, 2000] ___ So.2d ___ (Ala.Cr.App.2000); Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); and Ex parte Williams, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Hooks v. State, 534 So.2d 329 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989); Daniels v. State, 534 So.2d 658 (Ala.Cr.App.1987), aff'd, 534 So.2d 664 (Ala.1988), cert. denied, 488 U.S. 1051, 109 S.Ct. 884, 102 L.Ed.2d 1007 (1989).
Apicella's sentence to death is due to be, and is hereby, affirmed.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, and BASCHAB, JJ., concur.
NOTES
[1] Section 13A-5-40(a)(10), Ala.Code 1975, makes capital a murder "wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct."
[2] Section 12-16-150(1), Ala.Code 1975, states:

"It is good ground for challenge of a juror by either party:
"(1) That the person has not been a resident householder or freeholder of the county for the last preceding six months."
[3] The same trial judge presided over the trial of Apicella's codefendant, Stephen Pilley. Pilley was convicted of capital murder and the jury by a vote of 12-0, recommended the death penalty. On May 30, 1997, the trial court sentenced Pilley to death.
[4] Pilley's trial had been scheduled to begin on December 2, 1996, but was continued until April 7, 1997.
[5] The testimony indicated that a .25 caliber gun and a 9 mm gun were used in the murders.
[*] Note from the reporter of decisions: On July 21, 2000, the Supreme Court, on application for rehearing, withdrew its January 28, 2000, opinion and substituted another opinion. The quoted material appears in the opinion substituted on July 21, 2000.