WISE, Judge.
Stephen Pilley was convicted of murder made capital in connection with the deaths of Pamela Dodd, Lester Edward Dodd, William A. Nelson, Sr., James Watkins, and Florence Adell Elliott. The murders were made capital because they were committed “by one act or pursuant to one scheme or course of conduct.” See § 13A-5-40(a)(10), Ala.Code 1975. After a sentencing hearing, the jury unanimously recommended that Pilley be sentenced to death. The trial court accepted the jury’s recommendation and sentenced Pilley to death.
On August 14, 1998, this Court affirmed Pilley’s conviction and sentence. Pilley v. State, 789 So.2d 870 (Ala.Crim.App.1998). Pilley petitioned the Alabama Supreme Court for certiorari review on October 16, 1998. The Supreme Court granted the petition, pursuant to former Rule 39(c), Ala.R.App.P.[1] On January 28, 2000, the Supreme Court reversed Pilley’s conviction and sentence, holding that the circuit court should have declared a mistrial after learning that the deputy district attorney who tried this case contacted a juror who attended church with him after the jury was selected, but before Pilley’s trial began. However, the court noted, there was sufficient evidence from which the jury could have found either that Pilley was directly responsible for the murders or that he was an accomplice. Ex parte Pilley, 789 So.2d 888 (Ala.2000). The Supreme Court remanded Pilley’s case for this Court to order a new trial, which we did. Pilley v. State, 789 So.2d 895 (Ala.Crim.App.2000).
Pilley’s new trial began on October 1, 2001. After hearing all of the evidence, *556 the jury once again convicted Pilley of the same capital offense — murder made capital because the five homicides were committed “by one act or pursuant to one scheme or course of conduct.” Following a sentencing hearing, the jury recommended, by a vote of 10-2, that Pilley be sentenced to death. The circuit court adopted the jury’s recommendation and sentenced Pil-ley to death.
In the original opinion affirming Pilley’s capital-murder conviction and death sentence, this Court made detailed findings of fact, which the Supreme Court quoted in its opinion. We quote from those facts the facts presented during Pilley’s second trial, indicating by brackets the information gleaned from the evidence presented during this trial:
“On the morning of October 16, 1994, the bodies of Lester Edward Dodd, Pamela Dodd, William A. Nelson, Sr., James Watkins, and Florence Adell Elliott were found in the Changing Times Lounge, a neighborhood bar, in Birmingham. The Dodds, who worked at the bar, were found lying facedown in the pool-table area of the lounge, while the other three, who were regular bar patrons, were found lying facedown in the bar area. The positions of the bodies suggested an ‘execution style’ killing. All five died from gunshot wounds to the top or back of the head, inflicted by two distinctive types of handgun ammunition: .25 caliber CTI Blazer bullets and 9mm Glazer bullets. A forensic expert testified that, while no guns were ever recovered, he was certain that two weapons had been used in these murders. The bar had been ransacked, the cash register emptied, and the personal effects of the victims scattered around the bar.
“A bartender at the Crazy Eights Bar in Bessemer testified that, around 7:00 p.m. on October 15, 1994, while working in the bar, he overheard Pilley and Andrew Apicella discussing a way to make some ‘easy money.’ The bartender testified that he heard Pilley tell Apicella that he did not have a gun, and Apicella responded by telling him he could get guns. Shortly after this conversation, Pilley and Apicella left the Crazy Eights Bar.
“[A number of] customers who had been at the Changing Times Lounge at various times the night of October 15, 1994, identified Pilley as having been in the bar that night with another male. These witnesses remembered Pilley and his friend because they were not regular customers and because [either Pilley or his friend approached a regular customer at the jukebox, requesting that she play a particular song]. While Pilley’s friend was playing pool, Pilley would wander about the bar. The last of these witnesses to leave the bar testified that when he left at [approximately 12:30 a.m.], Pilley and his friend were still in the bar with about five other customers and the Dodds.
“Rhonda Haynes, a friend of Pilley’s, testified that, after she had gone to bed on the night of October 15, 1994, Pilley and Andrew Apicella came to her house unannounced, and asked her to arrange for a motel room where they could spend the night. They stayed with her until daybreak, injecting each other with a cocaine solution. During that stay, Haynes helped the two men count and divide money they claimed to have won at a bar playing pool.... From this money, Pilley handed Haynes five $2 bills, asking her to hold them for him.
“The former testimony of Pamela Haddix was read into evidence, indicating that Ms. Haddix had lived with one of the victims, William A. Nelson, Sr. *557 According to Ms. Haddix’s testimony, it was their custom to save $2 bills to give to their grandchildren as gifts. Ms. Haddix testified that, at the time of his death, Mr. Nelson had five $2 bills folded in a ‘secret pocket’ in his wallet.
“A lawyer, retained by the Apicella family on an unrelated matter, turned over to police jewelry that was subsequently identified as belonging to Pamela Dodd.”
789 So.2d at 874-75.
Sgt. Johnny Long, a Birmingham Police Department homicide detective, was the lead investigator of the murders at the Changing Times Lounge. During his investigation, Sgt. Long interviewed Pilley several times.[2] Pilley initially told Sgt. Long that the last time he had gone to the Changing Times Lounge was more than a month before the killings. However, in subsequent interviews, Pilley told Sgt. Long that he had, in fact, been in the lounge on the night of the killings, but he claimed that he went there alone and that he left before 11:00 p.m. Finally, Pilley told Sgt. Long that he had been in the Changing Times Lounge with Andrew Api-cella, who was his accomplice, but he denied knowing Apicella or participating in the robbery-homicides of the five victims. As a result of Sgt. Long’s investigation, he arrested two people — Pilley and Apicella— and charged them with capital murder.
At trial, Pilley denied any knowledge of Apicella’s plan to rob and murder the customers and employees of the Changing Times Lounge. Pilley claimed that Apicel-la had threatened him and his family if he told the police what had happened. Pil-ley’s version of the events surrounding the murders was detailed, but somewhat inconsistent. However, Pilley did not blame the inconsistencies on intoxication. Rather, Pilley claimed that he had not told the police the facts to which he now testified because, at the time of his interviews, he did not believe this information to be relevant to the investigation. Pilley also denied using cocaine at Rhonda Haynes’s house following the murders. He maintained that he filled his syringe with water, rather than a cocaine solution.
After both sides had rested and the circuit court had instructed the jury on the law applicable to Pilley’s case, the jury determined that the murders of the Dodds, Nelson, Watkins, and Elliott were committed pursuant to a common scheme or plan, and it convicted Pilley of capital murder.[3]
During the penalty phase of Pilley’s trial, the State resubmitted all of the evidence it had introduced during the guilt phase. Pilley presented no evidence. After both sides had rested and the circuit court had instructed the jury on the law applicable to the penalty phase, the jury returned an advisory verdict recommending that Pilley be sentenced to death.

Standard of Review

In every case in which the death penalty is imposed, this Court must review the record for any plain error, i.e., for any defect in the proceedings, whether or not the defect was brought to the attention of the trial court. Rule 45A, AIa.R.App.P., provides:
*558 “In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
As this Court stated in Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim. App.1999), aff'd, 820 So.2d 152 (Ala.2001):
“The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
Although Pilley’s failure to object at trial will not preclude this Court from reviewing an issue in this case, it will, nevertheless, weigh against any claim of prejudice he makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).

Guiltr-Phase Issues

I.
Pilley argues that the circuit court erred when it admitted the prior trial testimony of Dennis Michael Smith as an unavailable witness, rather than requiring the State to produce the witness in person.
Rule 804(a)(5), Ala.R.Evid., provides that a declarant is unavailable when he or she:
“(5) is absent from the hearing and the proponent of the statement has been unable to procure the declarant’s attendance ... by process or other reasonable means.”
The Alabama Supreme Court set out in Ex parte Scroggins, 727 So.2d 131 (Ala.1998), the requirements a prosecutor must meet in order to overcome a defendant’s Sixth Amendment right to confront witnesses against him and to be permitted to use the former testimony of a witness the State says is unavailable:
“When the prosecution seeks to introduce, against a criminal defendant, the former testimony of a now unavailable witness, its burden in seeking the witness’s presence is enhanced by the defendant’s Sixth Amendment right to confront witnesses. Ex parte Wright, 625 So.2d 1135, 1136 n. 2 (Ala.1993). Thus, when at trial the State wishes to use a person’s statement against a criminal defendant, in order for that statement to be admissible the State must either produce as a witness the person whose statement it wishes to use or else demonstrate that that person is ‘unavailable’ for the trial. Inmon v. State, 585 So.2d 261, 265 (Ala.Cr.App.1991).
“... In order for the admission of a statement of a witness who is not present at trial to satisfy the right to con *559 frontation of witnesses, the concerns of necessity and reliability must be satisfied. ‘The necessity concern customarily requires that the prosecution either produce or account for the unavailability of the declarant.’ [C. Gamble, McElroy’s Alabama Evidence § 242.01(7), p. 1132 (5th ed.1996)]. See Thompson v. State, 106 Ala. 67, 74, 17 So. 512, 514 (1895). Ohio v. Roberts [448 U.S. 56 (1980),] ‘mandates that the prosecution have made a good faith effort to obtain the presence of the declarant at trial.’ C. Gamble, supra, § 242.01(7), p. 1132.
“... Johnson v. State [623 So.2d 444, (Ala.Cr.App.1993) ] sets a high standard for proving that the State exercised due diligence in its attempt to procure the presence of a witness:
“ ‘A party seeking to introduce a witness’s testimony from a prior proceeding at a subsequent proceeding, must establish the unavailability of the witness and the reasons therefor. Lamar v. State, 578 So.2d [1382] (Ala.Cr.App.1991), cert. denied, Ex parte Lamar, 596 So.2d 659 (Ala.1991). This predicate is fulfilled when the party offering the evidence establishes that it has exercised due diligence in obtaining the witness, but without success. See Matkins v. State, 521 So.2d 1040, 1041-42 (Ala.Cr.App.1987).’
[[Image here]]
“Johnson’s standard of due diligence is based upon Alabama law holding that a declarant is not rendered ‘unavailable’ by absence alone. The party seeking to introduce the declarant’s statement has to show that it is unable to procure the declarant’s attendance either by legal process or by other reasonable means:
“ ‘If a witness who has given testimony in the course of a judicial proceeding between the parties litigant, before a competent tribunal, subsequently dies; or becomes insane; or after diligent search is not to be found within the jurisdiction of the court, or if that which is equivalent be shown, that he has left the state permanently, or for such an indefinite time that his return is contingent and uncertain, it is admissible to prove the substance of the testimony he gave formerly. The rule is, however, exceptional, and it is essential to the admissibility of the evidence that some one of the contingencies, which are deemed to create the necessity, be satisfactorily shown. Thompson v. State, 106 Ala. 67, 74, 17 So. 512 [ (1894) ].’
“Williams v. Calloway, 281 Ala. 249, 251-52, 201 So.2d 506, 508 (Ala.1967).
“While the question of the sufficiency of the proof offered to establish the predicate of a witness’s unavailability is addressed to the sound discretion of the trial judge, the issue is of constitutional significance in a criminal case and especially so in a capital one.”
727 So.2d at 133-34. See also Flowers v. State, 799 So.2d 966, 974-75 (Ala.Crim.App.1999).
The State offered the following facts in support of its claim that it had exercised due diligence in attempting to secure the attendance of Dennis Michael Smith to testify at Pilley’s second trial: In late September, the prosecutor contacted Lt. Thomas of the Bessemer Police Department in an attempt to locate Dennis Michael Smith. Lt. Thomas checked with some people before informing the prosecutor that no one had heard from Smith. Lt. Thomas also checked Smith’s arrest and jail records. However, Smith had had no recent arrests, so this avenue was unsuccessful. The prosecutor then sought the assistance of Morgan Knight, an investigator for the Jefferson County District Attorney’s Office, in locating Smith.
*560 Knight testified that the week before Pilley’s second trial was scheduled to begin, the deputy district attorney prosecuting the case asked for his assistance in locating Smith. Knight discussed with the prosecutor what efforts the prosecutor had already undertaken to locate Smith so as not to duplicate earlier efforts. Knight checked jail records to'determine if Smith was incarcerated. He also checked driver’s license records in an attempt to locate Smith. As a result, Knight discovered several local addresses where Smith was or had been living. Knight gave this information to the prosecutor, who stated that he would try to contact Smith; the prosecutor advised Knight that he would be back in touch with him if he needed additional assistance in locating Smith.
After Knight supplied the prosecutor with the additional information on Smith, the prosecutor unsuccessfully attempted to contact Smith at the given addresses. He contacted directory assistance to determine if Smith had a telephone listing at any of those addresses. Finally, the prosecutor had a subpoena issued ordering Smith’s attendance at trial. However, he was unable to obtain service of the subpoena on Smith.
Knight testified that after the prosecutor was unable to contact Smith at any of the local addresses previously supplied, the prosecutor again sought his assistance in searching for Smith. The prosecutor asked Knight to check all possible addresses for Smith, which he did. Because Knight had discovered that Smith had obtained a Kansas driver’s license, he attempted to locate Smith at the Garden City, Kansas, address given on the driver’s license. When Knight was unable to obtain a telephone number for Smith at the Kansas address, he contacted the local police department and requested their assistance. The local police went to Smith’s Kansas address on several occasions, but were unable to find anyone at home.
Knight also obtained Smith’s Social Security number from his jail records in an attempt to locate Smith. Knight determined that an individual using Smith’s Social Security number had applied for credit. The credit applications contained three addresses — one of which was the Garden City, Kansas, address on Smith’s driver’s license. However, Knight could not locate Smith at any of the addresses.
Given these circumstances, we conclude that the State proved that it used due diligence in an attempt to secure the attendance of Dennis Michael Smith. The State did “ ‘more than simply issue a subpoena and stop when it [was] returned “not found.” ’ ” Flowers v. State, 799 So.2d at 980 (opinion on return to remand) (quoting Manuel v. State, 803 P.2d 714, 716 (Okla.Crim.App.1990)). We know of no prescribed period of time the State is required to search for a witness in order to have exercised “due diligence.” Certainly, some individuals will be easier to find than others. As a convicted felon and a drifter, Smith obviously had no desire to be found by the State’s investigator or by any other law-enforcement officer. After all, if located, he would be required to return to Birmingham and testify against Pilley. “ ‘Rule 804(a)(5) does not require a proponent to butt his head against a wall just to see how much it hurts.’ ” Flowers v. State, 799 So.2d at 980 (opinion on return to remand) (quoting Urbano v. State, 808 S.W.2d 519, 522 (Tex.App.1991), citing in turn, United States v. Kehm, 799 F.2d 354, 360 (7th Cir.1986)). The record indicates that the State exhausted all possible leads and that it expended considerable resources in its attempt to locate Smith. Accordingly, we cannot say that the trial court abused its discretion when it determined that Smith was an “unavailable wit *561 ness” and permitted the State to read Smith’s previous testimony into the record at Pilley’s second trial.
We further note that because Smith was thoroughly cross-examined during Pilley’s first trial, admission of Smith’s previous testimony would not be barred by either the Confrontation Clause or by the United States Supreme Court’s decision in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In Craiuford, the United States Supreme Court held that the admission of a wife’s out-of-court statements to police officers, regarding an incident in which the defendant, her husband, allegedly stabbed the victim, violated the Confrontation Clause. The Supreme Court stated that an out-of-court testimonial statement by a witness is barred under the Confrontation Clause, unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness, 541 U.S. at 51-52, 124 S.Ct. 1354, regardless of whether the statement is deemed reliable by the trial court, abrogating its previous holding in Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Here, the previous testimony sought to be admitted was Smith’s testimony from Pilley’s first trial, where Pilley had an opportunity to fully and fairly cross-examine Smith. Accordingly, the decision in Craivford v. Washington serves as no impediment to the admission of Smith’s previous testimony. Pilley’s rights under the Confrontation Clause were not violated when the circuit court allowed the State to introduce Smith’s previous trial testimony.[4]
II.
Pilley next argues that the circuit court erred to reversal when it failed to instruct the jury on manslaughter as a lesser-included offense of capital murder based on Pilley’s alleged intoxication at the time of the offense. At trial, Pilley cited this Court’s decision in Fletcher v. State, 621 So.2d 1010 (Ala.Crim.App.1993), in support of his contention he was entitled to such an instruction. (R. 697-8.)
Pilley is correct in his assertion that where evidence of intoxication is presented the trial court must instruct the jury as to how this evidence relates to the intent to murder.
“A charge on intoxication should be given if ‘ “there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt” ’ in the element of intent. Coon v. State, 494 So.2d 184, 187 (Ala.Cr.App.1986) (quoting Government of the Virgin Islands v. Carmona, 422 F.2d 95, 99 n. 6 (3d Cir.1970)). See also People v. Perry, 61 N.Y.2d 849, 473 N.Y.S.2d 966, 966-67, 462 N.E.2d 143, 143-44 (App.1984) (‘[a] charge on intoxication should be given if there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis’). An accused is entitled to have the jury consider the issue of his intoxication where the evidence of intoxication is conflicting, Owen v. State, 611 So.2d 1126, 1128 (Ala.Cr.App.1992); Crosslin v. State, 446 So.2d 675, 682 (Ala.Cr.App.1983), where the defendant denies the commission of *562 the crime, Coon v. State, 494 So.2d at 187; see Moran v. State, 34 Ala.App. 238, 240, 39 So.2d 419, 421, cert. denied, 252 Ala. 60, 39 So.2d 421 (1949), and where the evidence of intoxication is offered by the State, see Owen v. State, 611 So.2d at 1127-28.”
Fletcher v. State, 621 So.2d at 1019. Additionally, “ ‘[w]hen the crime charged involves a specific intent, such as murder, and there is evidence of intoxication, the trial judge should instruct the jury on the lesser included offense of manslaughter.’ ” Harper v. State, 629 So.2d 67, 69 (Ala.Crim.App.1993), quoting Gray v. State, 482 So.2d 1318, 1319 (Ala.Crim.App.1985).
What Pilley fails to comprehend, however, is what constitutes “evidence of intoxication” necessary to entitle a defendant to such an instruction. The Alabama Legislature has defined “intoxication” to include “a disturbance of mental or physical capacities resulting from the introduction of any substance into the body.” § 13A-3-2(c)(l), Ala.Code 1975. Thus, evidence that the defendant ingested alcohol or drugs, standing alone, does not warrant a charge on intoxication. “[Tjhere must be evidence that the ingestion caused a disturbance of the person’s mental or physical capacities and that that mental or physical disturbance existed at the time the offense was committed." Lee v. State, 898 So.2d 790, 838 (Ala.Crim.App.2001) (opinion on return to remand), cert. denied, 898 So.2d 874 (Ala.), cert. denied, 543 U.S. 924, 125 S.Ct. 309, 160 L.Ed.2d 222 (2004). See also Maples v. State, 758 So.2d 1, 23 (Ala.Crim.App.), aff'd 758 So.2d 81 (Ala.1999). Such a holding is consistent with this Court’s opinion in Windsor v. State, 683 So.2d 1027, 1037 (Ala.Crim.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), in which we stated:
“In this case, however, there was no evidence that the appellant was intoxicated. Although there was evidence that the appellant had been drinking beer on the day of the robbery-murder, there was no evidence concerning the quantity of beer he consumed that day at the time of the murder. Evidence that someone was drinking an alcoholic beverage is not evidence that that person was intoxicated. There was no ‘reasonable theory’ to support an instruction on intoxication because there was no evidence of intoxication. There court did not err in not instructing the jury on intoxication and manslaughter where there was no evidence that the appellant was intoxicated at the time the robbery-murder occurred.”
A defendant is entitled to a charge on a lesser-included offense only if there is any reasonable theory from the evidence to support the charge. Ex parte Smith, 756 So.2d 957, 963 (Ala.2000). “[Ijnstructions on intoxication and manslaughter are not required when they would be inconsistent with the defense strategy.” Maples v. State, 758 So.2d at 23. Additionally, the court should charge on voluntary intoxication only when there is a sufficient evidentiary foundation in the record for a jury to entertain a reasonable doubt as to the element of intent. Ex parte McWhorter, 781 So.2d 330, 342 (Ala.2000).
Here, Pilley’s “evidence of intoxication” comes from the previously challenged testimony of Dennis Michael Smith, who testified that on the night in question Pilley and Apicella appeared “more plastered than they had usually been.” (R. 564.) However, Smith offered no testimony as to how much alcohol the pair had consumed or over what time period. Likewise, Pil-ley’s claim that he called out for a patron at the Changing Times Lounge to “play country music” on the jukebox fails to establish the requisite “evidence of intoxi *563 cation” that would warrant an instruction on intoxication. Certainly, a bar patron does not have to be intoxicated in order to request that another patron select a particular song or style of music to be played.
Further, an instruction on intoxication would be inconsistent with Pilley’s theory of defense — that of complete innocence. Pilley’s claim of intoxication is inconsistent with any of his statements to police: (1) that he had not been in the Changing Times Lounge on the night of the robbery-homicides; (2) that he was at the lounge, but that he was alone and left by 11:00 p.m.; and (3) that he went to the lounge with Apicella but denied any knowledge of Apicella’s plans and did not participate in the crimes. Finally, Pilley claimed that he was, at most, a “passive observer,” because Apicella threatened to kill him if he told anyone what he had witnessed that night. A claim of intoxication would be inconsistent not only with this defense strategy, but also with the detailed testimony Pilley offered at trial regarding the events surrounding the robbery-homicides. Pilley testified at length and in considerable detail about the events of the night in question — all the while maintaining his innocence of the crime with which he was charged — making no mention of intoxication. Indeed, Pilley went so far as to deny injecting himself with a cocaine solution at Haynes’s house later the night of the homicides. Instead, he claimed, he had injected himself with water — a claim one would not be likely to make if planning a defense strategy based on intoxication.
Quite simply, the testimony at trial failed to establish the “evidence of intoxication” necessary to justify an instruction on intoxication or the lesser-included offense of manslaughter based on Pilley’s inability to form the requisite intent to commit capital murder. Under § 13A-1-9(b), Ala.Code 1975, a trial judge is not required to instruct on a lesser-included offense “unless there is a rational basis for a verdict convicting the defendant of the included offense.” Because there was no rational basis for an instruction on intoxication and the lesser-included offense of manslaughter, the circuit court correctly denied Pilley’s requested jury charges.
III.
Pilley also argues that the circuit court erred to reversal when it denied his motion for a judgment of acquittal, based on the State’s failure to prove a prima facie case of capital murder. The gist of Pilley’s argument is that because the State’s case consisted primarily of circumstantial evidence, that evidence did not exclude every reasonable hypothesis except that of his guilt. Alternatively, Pilley argues that the State’s evidence failed to establish his guilt as an accomplice.
“ ‘ “In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.” ’ Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). ‘ “The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.” ’ Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). ‘ “When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in *564 such a case, this court will not disturb the trial court’s decision.” ’ Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). ‘The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.’ Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978).
“ ‘The trial court’s denial of a motion for judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference could find the defendant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, this court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983). When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for judgment of acquittal does not constitute error. McConnell v. State, 429 So.2d 662 (Ala.Cr.App.1983).’ ”
Gavin v. State, 891 So.2d 907, 974 (Ala.Crim.App.2003), cert. denied 891 So.2d 998 (Ala.2004), cert. denied, 543 U.S. 1123, 125 S.Ct. 1054, 160 L.Ed.2d 1073 (2005) (quoting Ward v. State, 610 So.2d 1190, 1191 (Ala.Crim.App.1992)). See also Ward v. State, 814 So.2d 899, 908-10 (Ala.Crim.App.2000), cert. denied, 814 So.2d 925 (Ala.2001).
“Where a defendant’s conviction is based solely on circumstantial evidence, ‘if the circumstances can be reconciled with the theory that someone else may have done the act, then the conviction is due to be reversed.’ Ex parte Brown, 499 So.2d 787, 788 (Ala.1986) (emphasis in original). ‘Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.’ White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). ‘Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.’ Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala.1985). ‘It is not necessary for a conviction that the defendant be proved guilty to the “exclusion of every possibility of innocence.” ’ Burks v. State, 117 Ala. 148, 23 So. 530 (1898). ‘The facts and circumstances in evidence, if dissevered and disconnected, may be weak and inconclusive; but their probative force, when combined, as it was the province of the jury to combine them, under proper instructions from the court, may have satisfied them of the guilt of the defendant.’ Howard v. State, 108 Ala. 571, 18 So. 813, 815 (1895).”
White v. State, 546 So.2d 1014, 1017 (Ala.Crim.App.1989). Accord Williams v. State, 795 So.2d 753, 775 (Ala.Crim.App.1999), aff'd, 795 So.2d 785 (Ala.2001).
Further, because intent is a state of mind, it is rarely susceptible of direct or positive proof. Instead, the element of intent must usually be inferred from the facts testified to by the witnesses together with the circumstances as developed by the evidence. Seaton v. State, 645 So.2d 341, 343 (Ala.Crim.App.1994) (quoting McCord v. State, 501 So.2d 520, 528-29 (Ala.Crim.App.1986)). Intent “ ‘ “may be *565 inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.” ’ ” Farrior v. State, 728 So.2d 691, 695 (Ala.Crim.App.1998) (quoting Jones v. State, 591 So.2d 569, 574 (Ala.Crim.App.1991), quoting, in turn, Johnson v. State, 390 So.2d 1160, 1167 (Ala.Crim.App.1980)). Finally, “ ‘[t]he intent of a defendant at the time of the offense is a jury question.’” C.G. v. State, 841 So.2d 281, 291 (Ala.Crim.App.2001), aff'd, 841 So.2d 292 (Ala.2002), quoting Downing v. State, 620 So.2d 983, 985 (Ala.Crim.App.1993).
Although a defendant does not personally commit the act of killing, he may nevertheless be convicted of capital murder under the principle of complicity. Section 13A-5^10(c), Ala.Code 1975, states:
“A defendant who does not personally commit the act of killing which constitutes the murder is not guilty of a capital offense defined in subsection (a) of this section unless that defendant is legally accountable for the murder because of complicity in the murder itself under the provisions of Section 13A-2-23, in addition to being guilty of the other elements of the capital offense as defined in subsection (a) of this section.”
Section 13A-2-23, Ala.Code 1975, provides:
“A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
“(1) He procures, induces or causes such other person to commit the offense; or
“(2) He aids or abets such other person in committing the offense; or
“(3) Having a legal duty to prevent the commission of the offense, he fails to make an effort he is legally required to make.”
This Court held in Gwin v. State, 456 So.2d 845, 851 (Ala.Crim.App.1984):
“ ‘Aid and abet “comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary.” ’ Jones v. State, 174 Ala. 53, 57, 57 So. 31 (1911), quoted in Radke v. State, 292 Ala. 290, 292, 293 So.2d 314 (1974). If the jury is convinced beyond a reasonable doubt that the defendant was present with a view to render aid should it become necessary, the fact that the defendant is an aider and abettor is established. Jones, supra; Raiford v. State, 59 Ala. 106, 108 (1877). ‘The culpable participation of the accomplice need not be proved by positive testimony, and indeed rarely is so proved. Fuller v. State, 43 Ala.App. 632, 198 So.2d 625 [(1966)]. Rather, the jury must examine the conduct of the parties and the testimony as to the surrounding circumstances to determine its existence.’ Miller v. State, 405 So.2d 41, 46 (Ala.Cr.App.1981); Watkins v. State, 357 So.2d 156, 159 (Ala.Cr.App.1977), cert. denied, 357 So.2d 161 (Ala.1978).”
Quoted with approval in Travis v. State, 776 So.2d 819, 862-3 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), cert. denied, 531 U.S. 1081, 121 S.Ct. 785, 148 L.Ed.2d 681 (2001).
The record indicates that the State presented sufficient evidence to prove the elements of the capital offense of the murder of two or more people pursuant to a common scheme or plan. As previously noted, the State presented much of the same evidence at Pilley’s retrial as it presented at Pilley’s original trial. Both this Court and the Supreme Court found the evidence presented sufficient to sustain a finding of *566 guilty as to capital murder. See Pilley v. State, 789 So.2d at 877; Ex parte Pilley, 789 So.2d at 894-5. Many of the same witnesses who testified at Pilley’s first trial also testified during his retrial. Here, as in Pilley’s first trial, witnesses established that Pilley was at the Changing Times Lounge on October 15, 1994 — the night of the robbery-homicides. Earlier that evening, Dennis Michael Smith, a bartender at the Crazy Eights Bar, overheard Apicel-la and Pilley talking about a way to make some easy money. Before the two men left the bar, Smith heard Pilley tell Apicel-la that he did not have a gun, to which Apicella replied that he could get guns.
After Pilley and Apicella arrived at the Changing Times Lounge, Apicella went to play pool. Pilley, however, was “antsy” and unable to sit still. At least one of the bar’s patrons noticed that Pilley was “up and down” — moving around the bar. Although no one during the second trial specifically described Pilley’s behavior as “nervous,” the jury would have been justified in making this inference based on Pilley’s behavior. The last of the witnesses to leave the bar testified that when he left around 12:30 a.m., Pilley and Api-cella were still inside the bar, along with a few other customers and the Dodds.
While investigating the robbery-homicides, police discovered that an undetermined amount of money had been taken from the bar and its patrons. One of the victims collected $2 bills and had five of the bills in his wallet just before his death.
Rhonda Haynes testified that Pilley and Apicella came to her house in the early morning hours of October 16, 1994. The two men remained at her house until daybreak. While at Haynes’s house, the men injected each other with a cocaine solution. They also counted and divided some money that they claimed they had won playing pool. Pilley gave Haynes five $2 bills to hold for him.
After the robbery-homicides were discovered, Pilley was interviewed a number of times by Birmingham police homicide detective Johnny Long. Pilley first denied having been in the Changing Times Lounge on the night of the homicides. However, with each succeeding interview Pilley’s version of events changed. He later told Long that he had come to the bar alone on the night of the homicides, and that he had left before 11:00 p.m. Ultimately, Pilley admitted being in the bar when the robbery-homicides took place, denying any knowledge of or participation in the robbery-homicides and maintaining that the entire scheme was Apicel-la’s idea.
Pilley’s version of events was called into question by all of the other evidence presented at trial, including forensic evidence indicating that the five robbery-homicide victims were killed by bullets fired from two different guns. When considered together, the State’s circumstantial evidence strongly suggests that Pilley was present when the victims were robbed and killed and that he participated in those offenses. In light of all the evidence presented by the State — including testimony from a witness who overheard Pilley and Apicella planning the robbery — Pilley’s presence during the robbery-homicides, together with the fact that Pilley and Apicella divided the proceeds of the robbery, was sufficient to sustain Pilley’s conviction for capital murder either as a principal or an accomplice.

Penalty-Phase Issues

IV.
After Pilley was retried and convicted, but before his appeal was taken under submission by this Court, the United States Supreme Court released Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 *567 L.Ed.2d 556 (2002), and Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) — two cases that dramatically impacted death-penalty cases throughout the United States. Because Pilley’s case was not final when Ring was released, we have applied Ring to this appeal.[5] See Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).
In Ring, the United States Supreme Court applied its earlier holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to death-penalty cases and held that “Capital defendants ... are entitled to a jury determination on any fact on which the legislature conditions an increase in their maximum punishment.” Ring, 536 U.S. at 589, 122 S.Ct. 2428.
In several recent decisions, both this Court and the Alabama Supreme Court have held that Ring did not invalidate Alabama’s death-penalty statute, which vests the ultimate determination for the sentence in the hands of the trial judge and not a jury. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala.2003); Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Duke v. State, 889 So.2d 1, 41 (Ala.Crim.App.2002) (opinion on return to remand), cert, granted, sentence of death vacated pursuant to Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), 544 U.S. 901, 125 S.Ct. 1588, 161 L.Ed.2d 270 (2005); Turner v. State, 924 So.2d 737 (Ala.Crim.App.2002); Stallworth v. State, 868 So.2d 1128, 1178 (Aa.Crim.App.2001) (opinion on return to second remand). In each of these cases, we recognized the narrowness of the holding in Ring, noting that “[t]he Ring Court held that any aggravating circumstance that increased a sentence to death must be proved to a jury beyond a reasonable doubt,” while noting that the Ring Court “did not reach the question whether judicial sentencing or judicial override was constitutional.” Stallworth v. State, 868 So.2d at 1183 (opinion on return to second remand).
Here, the jury in the guilt phase entered a verdict finding Pilley guilty of capital murder. Pilley’s case, however, differs from that of Waldrop, Hodges, Turner, and Stallworth because at the time Pilley committed these offenses, the fact that the defendant “intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct” did not, of itself, constitute an aggravating circumstance.[6] However, this does not require that Pilley’s death sentence be set aside. Our review of the court’s penalty-phase instructions reveals that the court instructed the jury on two aggravating circumstances it could consider: (1) that the capital offense was committed while Pilley was under a sentence of imprisonment pursuant to § 13A-5A9(1), Aa.Code 1975; and (2) that the capital offense was committed while Pilley was engaged in or as an accomplice in the commission of first-degree robbery, see § 13A~5-49(4), Aa.Code 1975. Further, the court repeatedly instructed the jury that it could not proceed to a vote on whether to impose the death penalty unless it first unanimously found the existence of at least one aggravating circumstance. (R. 821, 821, 822, 824.) Because the jury recommended by a vote of 10-2 *568 that Pilley be sentenced to death, it is clear that it unanimously found the existence of at least one aggravating circumstance. See Ex parte McNabb, 887 So.2d 998 (Ala.2004) (recognizing that even a nonunanimous recommendation of death by the jury proved that the jury, including the jurors who voted against the recommendation of death, had unanimously found the existence of a proffered aggravating circumstance, even though the circumstance was not included within the definition of the particular capital-murder offense charged in the indictment, because the trial court had specifically instructed the jury that it could not proceed to a vote on whether to impose the death penalty unless it had already unanimously agreed that an aggravating circumstance existed). Thus, no Ring violation is present in this case.
V.
We note that § 13A-5-47(d), Ala.Code 1975, provides, in pertinent part, that “the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52.”
We have carefully reviewed the circuit court’s sentencing order. However, the court’s order does not contain specific written findings concerning the existence or • nonexistence of each aggravating circumstance enumerated in § 13A-5-49. Instead, the court listed only the aggravating circumstances it found existed: (1) that the capital offense was committed by a person under sentence of imprisonment, and (2) that the capital offense was committed while the defendant was engaged or was an accomplice in the commission of first-degree robbery. These were the only two aggravating circumstances found to exist. Thus, the court’s findings with regard to the aggravating circumstances are technically deficient. This Court addressed a similar situation in Fortenberry v. State, 545 So.2d 129 (Ala.Crim.App.1988), aff'd, 545 So.2d 145 (Ala.1989). There, the trial court’s sentencing order made specific written findings as to only the aggravating circumstance it found to be supported by the evidence. Although we found the court’s sentencing order to be technically deficient, we found such error to be harmless:
“While the trial court’s sentencing order is defective, the errors are not so egregious or substantial as to require a new sentencing order. ‘The sole purpose of requiring that the trial judge, as the sentencing authority, make a written finding of the aggravating circumstance is to provide for appellate review of the sentence of death.’ Ex parte Kyzer, 399 So.2d 330, 338 (Ala.1981). ‘[T]he harmless error rule does apply in capital cases at the sentence hearing.’ Ex parte Whisenhant, 482 So.2d 1241, 1244 (Ala.1983).”
545 So.2d at 144. Accord Bryant v. State, [Ms. CR-98-0023, April 29, 2005] - So.2d -, - (Ala.Crim.App.1999) (opinion on return to remand); Gavin v. State, 891 So.2d 907, 995 (Ala.Crim.App.2003), cert. denied, 891 So.2d 998 (Ala.2004); Stewart v. State, 730 So.2d 1203, 1219 (Ala.Crim.App.1996), aff'd, 730 So.2d 1246 (Ala.1999).
Nothing in the record indicates that the circuit court refused or failed to consider any aggravating circumstances. Because the circuit court’s findings regarding the aggravating circumstances it found to exist in this case are sufficient for this Court to carry out its appellate review, a remand for the entry of a new sentencing *569 order is not warranted. See Slaton v. State, 680 So.2d 879, 907 (Ala.Crim.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997). However, we note— as we did in Fortenberry: “ ‘the safer practice would have been for the trial judge to simply follow the verbiage of the statute in negating aggravating circumstances.’ Berard v. State, 402 So.2d 1044, 1051 (Ala.Cr.App.1980).” 545 So.2d at 144.
The circuit court’s findings with regard to the existence of any statutory mitigating circumstances are also technically deficient, although for a different reason. During the penalty phase, Pilley presented no evidence of mitigation. Nevertheless, the circuit court made specific findings with regard to five of the seven statutory mitigating circumstances set out in § 13A-5-51, Ala.Code 1975.[7] Unfortunately, the court’s order did not contain specific findings with regard to the remaining two statutory mitigating circumstances.[8] It is clear, however, from the court’s order that the court considered each of the statutory mitigating circumstances, ultimately determining that no statutory mitigating circumstance existed. Although this Court has remanded a number of capital-murder cases for the circuit court to specifically address each of the statutory mitigating circumstances, as required by § 13A-5-47(d), a remand is not possible in this case because the trial judge who sentenced Pilley is no longer a circuit court judge.[9] Given similar circumstances, both this Court and the Supreme Court have held that, although under normal circumstances a remand would be necessary, no remand was required. See Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003). Given these unique circumstances, we do not find it to be in the interests of judicial economy to remand this case for a new sentencing order, in light of the fact that the trial judge found the existence of no mitigating circumstances at Pilley’s first trial and because Pilley presented no evidence in support of any of the statutory mitigating circumstances enumerated in § 13A-5-51, Ala. Code 1975. Moreover, given that no evidence in the record supports the existence of the two mitigating circumstances the circuit court failed to address, we find the court’s omission of these two mitigating circumstances to be harmless. However, our decision should not be interpreted as condoning a trial court’s failure to strictly comply with the requirements of § 13A-5-47, Ala.Code 1975. We remind the circuit court that “ ‘the safer practice would have been for the trial judge to simply follow the verbiage of the statute in negating aggravating [and mitigating] circumstances.’ Berard v. State, 402 So.2d 1044, *570 1051 (Ala.Cr.App.1980).” Fortenberry v. State, 545 So.2d at 144.
VI.
As required by § 13A-5-53, Ala.Code 1975, we will now address the propriety of Pilley’s death sentence.
Pilley was indicted and convicted of murdering two or more people “by one act or pursuant to one scheme or course of conduct.” § 13A-5-40(a)(10), Ala.Code 1975. The jury, by a vote of 10 to 2, recommended that Pilley "be sentenced to death.
The record reflects that Pilley’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A — 5—53(b)(1), Ala. Code 1975.
The circuit court found that the aggravating circumstances outweighed the mitigating circumstances and mandated that Pilley be sentenced to death. The court found the existence of two aggravating circumstances: (1) that the capital offense was committed while Pilley was under a sentence of imprisonment pursuant to § 13A-5-49(l), Ala.Code 1975; and (2) that the capital offense was committed while Pilley was engaged in or as an accomplice in the commission of first-degree robbery, see § 13A-5-49(4), Ala.Code 1975. The circuit court found the existence of none of the mitigating circumstances enumerated in § 13A-5-51, Aia. Code 1975, specifically referencing five of the seven statutory mitigating circumstances enumerated in § 13A-5-51. The court found the existence of no nonstatuto-ry mitigating circumstances, as provided for in § 13A-5-52, Ala.Code 1975.
The circuit court’s finding that the aggravating circumstance that the murder was committed while Pilley was under sentence of imprisonment is supported by the evidence. The State presented evidence indicating that at the time of this offense Pilley was on probation as a result of a 1991 conviction for first-degree arson in Pinellas County, Florida. See Tarver v. State, 500 So.2d 1232, 1251 (Ala.Crim.App.1986), aff'd, 500 So.2d 1256 (Ala.1986), cert. denied 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987) (the definition of “under term of imprisonment” in § 13A-5-49(1) encompasses persons on probation or parole). The circuit court’s finding that the murders were committed during the commission of first-degree robbery is likewise supported by the record, as is the circuit court’s finding that no statutory mitigating circumstances or nonstatutory mitigating circumstances existed. We agree with the circuit court’s findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires us to independently weigh the aggravating and mitigating circumstances to determine the propriety of Pilley’s death sentence. After independently weighing the aggravating circumstances and the mitigating circumstances, we find that the death sentence is appropriate in this case.
As required by § 13A-5-53(b)(3), Ala.Code 1975, we must determine whether Pilley’s death sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. Pilley either murdered or was an accomplice in the murder of five individuals pursuant to a common scheme or plan. Similar crimes have been punished by death on numerous occasions. See, e.g., Miller v. State, 913 So.2d 1148, 1154 (Ala.Crim.App.2004), opinion on return to remand (three deaths); Apicella v. State, 809 So.2d 841 (Ala.Crim.App.2000), aff'd, 809 So.2d 865 (Ala.2001), cert. denied, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 706 (2002) (five deaths); Samra v. State, 771 So.2d 1108 *571 (Ala.Crim.App.1999), aff'd, 771 So.2d 1122 (Ala.), cert. denied, 531 U.S. 933, 121 S.Ct. 317, 148 L.Ed.2d 255 (2000) (four deaths); Williams v. State, 710 So.2d 1276 (Ala.Crim.App.), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998) (four deaths); Taylor v. State, 666 So.2d 36 (Ala.Crim.App.), on remand, 666 So.2d 71 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996) (two deaths); Siebert v. State, 555 So.2d 772 (Ala.Crim.App.), aff'd, 555 So.2d 780 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990) (three deaths); Holladay v. State, 549 So.2d 122 (Ala.Crim.App.1988), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989) (three deaths); Fortenberry v. State, 545 So.2d 129 (Ala.Crim.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990) (four deaths); Hill v. State, 455 So.2d 930 (Ala.Crim.App.), aff'd, 455 So.2d 938 (Ala.), cert. denied, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984) (three deaths).
Finally, as required by Rule 45A, Ala. R.App.P., we have searched the record for any error that may have adversely affected Pilley’s substantial rights and have found none. Pilley’s conviction and sentence of death for the murders of Pamela Dodd, Lester Edward Dodd, William A. Nelson, Sr., James Watkins, and Florence Adell Elliott are due to be, and are hereby, affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and SHAW, JJ., concur.

. Rule 39, Ala.R.App.P., was amended, effective May 19, 2000, as to death-penalty cases, changing the standard for certiorari review of criminal cases in which the death penalty is imposed. At the time Pilley's petition was filed, Rule 39(c) provided that a petition for a writ of certiorari to the Supreme Court in a case in which the death penalty was imposed would be granted as a matter of right.

. Sgt. Long testified that he advised Pilley of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before interviewing him. Pilley elected to waive those rights and answer questions.

. Andrew Apicella was likewise convicted of capital murder and sentenced to death for his role in this offense. On June 30, 2000, this Court affirmed Apicella's conviction and sentence. Apicella v. State, 809 So.2d 841 (Ala.Crim.App.2000), aff'd, 809 So.2d 865 (Ala.2001), cert. denied, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 706 (2002).

. We note that the admissibility of the former testimony of Pamela Haddix was not raised. Haddix's unavailability was established at Pil-ley's first trial. See Nettles v. State, 731 So.2d 626, 629 (Ala.Crim.App.1998) (this Court may take judicial notice of its own records). Nevertheless, this discussion is equally applicable to the admission of Pamela Haddix's preliminary-hearing testimony. Because Haddix’s testimony was given under oath and Pilley’s defense counsel were afforded the opportunity to cross-examine her, no violation of Pil-ley’s rights under the Confrontation Clause occurred.

. Atkins addresses the rights of mentally retarded persons who have been sentenced to death. Nothing in the record suggests that Pilley was mentally retarded. Thus, Atkins has no application to this case.

. Section 13A-5-49, Ala.Code 1975, was amended, effective September 1, 1999, to make the death of two or more persons by one course of conduct an aggravating circumstance. See § 13A~5-49(9), Ala.Code 1975.

.The court's order specifically rejected the following mitigating circumstances: (1) that Pilley had no significant history of prior criminal activity (§ 13A — 5—51 (1)); (2) that Pilley's participation in the capital offense was not "relatively minor” (§ 13A — 5—51 (4)); (3) that Pilley acted under extreme duress or under the substantial domination of another person (§ 13A — 5—51 (5)); (4) that Pilley was capable of appreciating the criminality of his conduct (§ 13A — 5—51 (6)); and (7) Pilley’s age — Pilley was approximately 40 years old when the crime occurred (§ 13A — 5—51(7)); thus, his age was not a mitigating factor.

. The two statutory mitigating circumstances the court neglected to address were: (1) that Pilley committed the capital offense while under the influence of extreme mental or emotional disturbance (§ 13A — 5—51 (2)); and (2) that the victims were participants in or consented to Pilley’s conduct (§ 13A — 5—51(3)).

. We take judicial notice that the trial judge in this case, James S. Garrett, is now retired.